UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JOHN DOE #2, ET AL.                          CIVIL ACTION

v.                                           NO. 08-1172

TANGIPAHOA PARISH SCHOOL BOARD,              SECTION "F"
ET AL.

<u>ORDER AND REASONS</u>

Amendment I

> Congress shall make no law respecting an
> establishment of religion, or prohibiting the
> free exercise thereof;....

One wonders whether the Founding Fathers ever envisioned the intense ... at times, malevolent ... discourse these simple, instructive words would evoke throughout the land for over 200 years.  Should "In God We Trust" be removed from our currency?  Should the opening of Court not begin with an incantation to God to "save the United States and this Honorable Court"?  Indeed, should reference to an awareness of God be stricken from the federal Constitutional oath of office?  Or from the revered Declaration of Independence?  Where does the injunction of the First Amendment lead us?

This case involves a prayer...a Christian prayer...at school board meetings in Tangipahoa Parish.

Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the motions are DENIED. This Court holds that the U.S. Supreme Court's exception for legislative prayer applies to the Tangipahoa Parish School Board. Whether the School Board can avoid charges of exploitation of religion and proselytizing must await trial.

## Background

This lawsuit arises out of a challenge by public school students and their parents to the Tangipahoa Parish School Board's policy of opening school board meetings with a prayer delivered by a member of the local clergy.

*Procedural History*

In 2003, "John Doe" filed suit in federal court against the defendants, alleging that their practice of opening School Board meetings with a prayer violated the Establishment Clause of the First Amendment to the U.S. Constitution. Ruling that Marsh v. Chambers does not apply in the public school context, another Section of this Court held that the defendants' practice was unconstitutional and enjoined them. See Doe v. Tangipahoa Parish Sch. Bd., No. 03-2780, 2005 WL 517341, at *5-9 (Feb. 24, 2005). Assuming without deciding that the School Board was a "legislative or other deliberative body" within the meaning of the Supreme Court's Marsh v. Chambers decision, a divided panel of the Fifth Circuit then affirmed in part, holding that the School Board's

2

practice of opening its meetings with a sectarian Christian prayer fell outside the <u>Marsh</u> legislative prayer exception. <u>Doe v. Tangipahoa Parish Sch. Bd.</u>, 473 F.3d 188, 197, 205 (5th Cir. 2006), <u>vacated on reh'g en banc</u>, 494 F.3d 494 (5th Cir. 2007). But, on rehearing *en banc*, the Fifth Circuit reconsidered and held that the district court record contained insufficient evidence that the plaintiff Doe had ever attended any Board meetings; the Court of Appeals vacated and remanded the divided panel decision, on the single ground that the plaintiff had not proved standing to bring suit. <u>Doe v. Tangipahoa Parish Sch. Bd.</u>, 494 F.3d 494, 499 (5th Cir. 2007) (*en banc*). After the School Board adopted a new policy in August 2007, John Doe again filed suit (on behalf of himself and his minor child, "Minor Doe"), along with his wife, "Sally Doe", and his daughter, "Jane Doe."

*The School Board*

The Tangipahoa Parish School Board is by law responsible for the operation and government of the 35 public schools, with more than 18,000 students, that comprise the Tangipahoa Parish School System. The Board holds public meetings twice monthly in the board room of the School System's Central Office in Amite, Louisiana.

Tangipahoa is a largely Christian community, and all current Board members identify themselves as Christians. The Parish is also home to many residents of non-Christian faiths (and to residents of no faith at all).

The School Board has no student board members. Nor are students required to attend School Board meetings. Students are, however, regularly invited to attend and do participate in School Board meetings, by leading the Pledge of Allegiance, reciting the Preamble to the U.S. Constitution, and performing patriotic songs. The School Board also invites students to meetings to receive special recognition and rewards, and students participate in special ceremonies held during such meetings. Students also have the right to attend Board meetings to appeal certain disciplinary actions, such as expulsion, and to object to or comment on Board policies.

*The Board's Policy*

The Tangipahoa Parish School Board "has long maintained a tradition of solemnizing its proceedings by allowing for an opening prayer before each meeting, for the benefit and blessing of the Board."[1]  The School Board has opened its meeting with an invocation since 1973; board members, teachers, students, and invited clergy have delivered the prayers, which often have referred to Jesus or other Christian themes.  In August 2004, several months after John Doe filed his first suit against the

---

[1] Indeed, the School Board had an earlier and challenged history of sponsoring prayer and promoting Christianity in the public schools it governs.  See, e.g., Freiler v. Tangipahoa Parish Bd. of Edu., 185 F.3d 337 (5th Cir. 1999)(parents succeeded in challenging school board's requirement that disclaimer be read immediately before teaching evolution classes).

School Board and its members, the Board members considered requiring that these invocations be nonsectarian and nonproselytizing, but apparently unanimously rejected the proposal.

On August 21, 2007, less than a month after the Fifth Circuit issued its *en banc* ruling, and vacated its divided panel decision, the School Board voted "to adopt [a] formal, written policy to clarify and codify its invocation practices." The new policy authorizes the School Board to invite and host a rotating roster of Parish clergy to deliver prayers to "solemnize proceedings" and "acknowledge and express the Board's respect for the diversity of religious denominations and faiths... practiced among the citizens of Tangipahoa Parish."

The current statement of the School Board's policy, on its face, articulates homage and respect to diverse established religious faiths:

1.  In order to solemnize proceedings of the Tangipahoa Parish School Board, it is the policy of the Board to allow for an invocation or prayer to be offered before its meetings for the benefit of the Board.
2.  The prayer shall not be listed or recognized as an agenda item for the meeting or as part of the public business.
3.  No member of employee of the Board or any other person in attendance at the meeting shall be required to participate in any prayer that is offered.
4.  The prayer shall be voluntarily delivered by an eligible member of the clergy in the Parish of Tangipahoa, Louisiana. To ensure that such person (the "invocation speaker") is selected from among a wide pool of the parish's clergy, on a rotating basis, the invocation speaker shall be selected according to the following procedure:

a.  The Secretary to the Tangipoha Parish School
    Board (the "Secretary") shall compile and
    maintain a database (the "Congregations List")
    of the religious congregations with an
    established presence in the local community of
    Tangipahoa Parish.

b.  The Congregations List shall be compiled by
    referencing the listing for "churches,"
    "congregations," or other religious assemblies
    in the annual Yellow Pages phone book(s)
    published for Tangipahoa Parish, research from
    the Internet, and consultation with local
    chambers of commerce. All religious
    congregations with an established presence in
    the local community of Tangipahoa Parish are
    eligible to be included in the Congregations
    List, and any such congregation can confirm
    its inclusion by specific written request to
    the Clerk.

c.  The Congregations List shall also include the
    name and contact information of any chaplain
    who may serve one or more of the fire
    departments or law enforcement agencies of
    Tangipahoa Parish.

d.  The Congregations List shall be updated by
    reasonable efforts of the Secretary, in
    November of each calendar year.

e.  Within thirty (30) days of the effective date
    of this policy, and on or about December 1 of
    each calendar year thereafter, the Secretary
    shall mail an invitation addressed to the
    "religious leader" of each congregation listed
    on the Congregations List, as well as to the
    individual chaplains included on the
    Congregations List.

f.  The invitation shall be dated at the top of the
    page, signed by the Secretary at the bottom of the
    page, and read as follows:

*Dear Religious Leader,*

*The Tangipahoa Parish School Board makes
it a policy to invite members of the clergy in
Tangipahoa Parish to voluntarily offer a
prayer before the beginning of its meetings
for the benefit and blessing of the Board. As
the leader of one of the religious
congregations with an established presence in*

> *the local community, or in your capacity as a chaplain for one of the local fire departments or law enforcement agencies, you are eligible to offer this important service at an upcoming meeting of the Board.*
>
> *If you are willing to assist the Board in this regard, please send a written reply at your earliest convenience to the Board secretary at the address included on this letterhead. Clergy are scheduled on a first-come, first-serve basis. The dates of the Board's scheduled meetings for the upcoming year are listed on the following attached page. If you have a preference among the dates, please state that request in your written reply.*
>
> *This opportunity is voluntary and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocation speaker, nor to disparage any faith or belief different than that of the invocation speaker.*
> ...

   g. As the invitation letter indicates, the respondents to the invitation shall be scheduled on a first-come, first-serve basis to deliver the invocations.

5. No invocation speaker shall receive compensation for his or her service.

6. The Secretary shall make every reasonable effort to ensure that a variety of eligible invocation speakers are scheduled for the Board meetings. In any event, no invocation speaker shall be scheduled to offer a prayer at consecutive meetings of the Board, or at more than three (3) Board meetings in any calendar year.

7. Neither the Board nor the Secretary shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocation speaker.

8. Shortly before the opening gavel that official

begins the meeting and the agenda/business of the public, the President of the Board shall introduce the invocation speaker and the person selected to recite the Pledge of Allegiance following the invocation, and invite only those who wish to do so to stand for those observances of and for the Board.[2]

9. This policy is not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board's preference for or against, any faith or religious denomination. Rather, this policy is intended to acknowledge and express the Board's respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Tangipahoa Parish.

10. To clarify the Board's intentions, as stated herein

---

[2] On April 9, 2009, the School Board unanimously voted to adopt a revision to this paragraph, to clarify in writing what the Board says has been its actual practice since the time of the policy's adoption on August 21, 2007; the amended paragraph 8 reads:

Shortly before the opening of the gavel that officially begins the meeting and the agenda/business of the public, the President of the Board shall introduce the invocation speaker and invite only those who wish to do so to stand for this observance of and for the Board. No person who may be scheduled to speak and/or offer, perform, or recite the Pledge of Allegiance, National Anthem, Preamble to the Constitution, or other ceremonial gesture after the Board meeting begins shall be required to attend or observe any invocation offered before the Board meeting. Instead, such person shall always be introduced and invited to speak or perform after the subsequent opening gavel and call to order for the meeting, and, unlike the invocation, such person's speech or performance shall be formally recognized and listed as a full part of the Board meeting and agenda.

above, the following disclaimer shall be included in at least 10 point font at the bottom of any printed Board meeting agenda: "Any invocation that may be offered before the official start of the Board meeting shall be at the voluntary offering of a private citizen, to and for the benefit of the Board. The views or beliefs expressed by the invocation speaker have not been previously reviewed or approved by the Board, and the Board does not endorse the religious beliefs or views of this or any other speaker."

The Invocation Policy was unanimously adopted, 9-0.

In carrying out the policy, School Board Secretary, Cynthia Jenkins, compiles the Congregation List by consulting the local yellow pages telephone directory; she copies the alphabetical listing for all "Churches" included there, and that became the Board's initial mailing list.[3] The School Board then sends a letter to religious leaders within the geographical boundaries of Tangipahoa Parish. Any congregation within the Parish can confirm its inclusion by submitting a written request to the Board. The only churches or religious congregations excluded from the mailing list are those that are outside the geographic boundaries of Tangipahoa Parish.[4]

---

[3] She also says that she double-checked on the internet to confirm precise addresses and locations of a handful of churches to ensure the churches were located within the Parish line.

[4] Whether appearance and practice equate with one another, is a serious and disputed issue. In 2007 and 2008, the congregation list included Christian congregations from outside the Parish lines (contrary to the letter of the policy), but included no churches of other, non-Christian denominations, even though there are some closer to Tangipahoa Parish than the additional Christian churches located outside of Tangipahoa Parish. Indeed,

The Board has no editorial power over the prayer's content. It keeps its distance. With its written disclaimer printed on each meeting agenda, the Board specifically denies any approval or endorsement of the religious beliefs or views of the invocation speakers. (When defendant Caves, the Board's Policy Committee Chairman, was asked if someone would be allowed to deliver a Satanic invocation, he responded: "...As long as it follows the policy, I don't care what denomination they are....[W]e can't discriminate." Other Board members, however, have suggested that the intent of the policy was to begin the meetings with Christian prayer.)

The pre-meeting prayer is voluntary: it is offered 5 to 7 minutes before the Board meeting begins, and is followed by a 3 to 4 minute break before the opening gavel and formal call to order.[5] After the call to order, if any student guest is present to lead the Pledge of Allegiance or sing a patriotic song, the guest is introduced at that point, post-gavel, and performs.

The Does have each attended Board meetings (or, in the case of

---

during oral argument, counsel for the School Board admitted that Ms. Jenkins twice (mistakenly) invited Christian clergy from outside the Parish, but never "mistakenly" or otherwise invited non-Christian clergy from outside the Parish. That is of concern to the Court.

[5] Members of the public are free to enter and exit the meeting room at will through a set of doors in the back of the room.

Minor Doe, claim to intend to do so in the future) where invocations were given.[6]   Because of some unspecific student presence in School Board meetings, the Does bring this action (their second challenge pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201) to the right of Tangipahoa Parish School Board to sanction pre-meeting prayer.   They seek a declaratory judgment that the defendants' policy violates the Establishment Clause of the First Amendment, and injunctive relief to enjoin defendants from

---

[6] Four of the meetings in particular (attended by John Doe) began with following invocations:

- On October 2, 2007, Rev. Francis Williams, of Butlers A.M.E. Zion Church prayed: "Overall give us an understanding that we may be able to come together and live according to your holy word.   One Lord, One Faith, One Baptism.... That together we may grow and be one.   In Jesus' name we pray. Amen."
- On January 22, 2008, Jerusalem Baptist Church Rev. Stacy Morgan's prayer included: "Not only are they accountable to their conscience, nor are they only accountable to their constituents but, more importantly, they are accountable to an eternal God....  In Christ name, we pray, Amen."
- On February 19, 2008, Rev. Robert Mader, of the St. Paul Lutheran Church, prayed: "Heavenly Father, Lord of the universe, King of all creations, you have made all things and you have made us in your image and in your likeness....  In thy name, the precious name of Jesus the Christ. Amen."
- On March 4, 2008, Rev. Bobby Showers, in his closing remarks referenced Jesus Christ.

continuing the practice. The plaintiffs and the defendants now both seek summary judgment.

I.

Standing

As a threshold issue, before proceeding to the merits of the Establishment Clause issue, the Court must be satisfied that the Does have standing to challenge the School Board's invocation policy.

Article III of the United States Constitution commands that a litigant must have standing to invoke the power of a federal court. The Court's focus, in assessing standing, is on the parties' right to have the Court decide the merits of the dispute. <u>See</u> <u>Doe v. Beaumont Indep. Sch. Dist.</u>, 240 F.3d 462, 466 (5th Cir. 2001)(citing <u>Warth v. Seldin</u>, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). To establish standing, the Does must show that they each personally suffered some actual or threatened "injury in fact" that is "fairly traceable" to the challenged policy that "would be redressed" by a favorable decision in Court. <u>See</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).[7]

The Court must also be faithful to three prudential concerns

---

[7] The actual injury requirement ensures that issues will be resolved "not in the rarified atmosphere of a debating society, but in a concrete factual context." <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

when assessing standing:

1) whether the plaintiff's complaint falls within the zone of interests protected by the...constitutional provision at issue;
2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by legislative branches; and
3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir. 1991). "Standing to sue must be proven, not merely asserted, in order to provide a concrete case or controversy and to confine the courts' rulings within our proper judicial sphere." Doe v. Tangipahoa Parish School Bd., 494 F.3d 494, 499 (5th Cir. 2007) (noting that "[n]o amount of creative inferences from the pretrial order or 'stipulations' can overcome [the necessary proof in the record required to show standing]" and that the Board's failure to contest standing cannot create jurisdiction because standing is not subject to waiver by the parties).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The question becomes whether the Does have alleged a personal loss of First Amendment freedoms; "[i]t is not enough to simply argue that there has been some violation of the Establishment Clause; they must allege a personal violation of rights." See Croft v. Governor of Texas, 562 F.3d 735, 745 (5th

Cir. 2009)(citations omitted).

The plaintiffs are Tangipahoa Parish schoolchildren and their parents "who are directly affected by the...practices against which their complaints are directed." See Abington School District v. Schempp, 374 U.S. 203, 225 n.9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). (The parents, John and Sally Doe, corrected the earlier standing flaw and now sue on behalf of themselves and as parent and next friend of their minor child, Minor Doe.) The record evidence reflects that each of the plaintiffs, except Minor Doe, who allegedly plans to attend meetings in the future, have attended Board meetings where invocations were given, and have been exposed to prayers;[8] each one of the plaintiffs intends to attend School

---

[8] John Doe has attended many Board meetings both before and after the adoption of the August 2007 invocation policy; invocations were given at almost every Board meeting he has attended, and every one of the prayers was Christian (including prayers delivered at the October 2, 2007, January 22, 2208, February 19, 2008, and March 4, 2008 meetings. Sally Doe attended Board meetings prior to the adoption of the August 2007 policy, but invocations were given at the meetings she attended. Sally Doe intends to attend Board meetings in the future.
     Jane Doe, who apparently recently graduated from a Parish school, attended one Board meeting during the 2007-2008 school year to speak on a school policy matter. Jane believes that the School Board does not care about her feelings on the issue of school board prayer. Also, she says she has Wiccan, atheist, and Satanist friends, and she objects to the Board's policy and believes it is offensive and unfair to non-Christians. Finally, Minor Doe is enrolled in a Parish school. She uncertain about what she believes, but does not subscribe to the same Christian belief system as most of her classmates (she does believe in some type of higher power and prayer). Minor Doe has not attended a School Board meeting, but she plans to go and would like to participate by leading the Pledge of Allegiance or reciting the Preamble to the Constitution; however, she is concerned that she will be subjected

Board meetings in the future (even Jane Doe, who apparently has since graduated from the high school). Each of the plaintiffs have established injury in fact on this record. As attendees of the meetings, they have, if the prayer policy is found to be unconstitutional, suffered an injury that is traceable to the defendants' prayer policy, and their injuries would be redressed if the Court enjoined the Board from continuing its prayer policy. Each of the Does, at the very least, has alleged sufficient threatened injury, cf. Doe v. Beaumont Indep. Sch. Dist., 240 F.3d 462, 466 (5th Cir. 2001) (students attending public school and parents of students attending public school "enjoy a cluster of rights vis-a-vis their schools – a relationship which removes them from the sphere of 'concerned bystanders'"), and the Doe parents and Jane Doe have alleged actual exposure to the offensive practice. See Doe v. Tangipahoa Parish School Bd., 494 F.3d 494, 497 (5th Cir. 2007)(noting that there was "no evidence of...exposure [to invocations] in the record of this case, which was...tried on stipulations"). The plaintiffs have standing.[9] See Wynne v. Town

_____

to prayer at the meeting and she worries she would be heckled whether she stood up for the prayer or not (because others would pick on her either way, knowing she did not share their beliefs). Minor Doe would like for the invocation policy to cease so she can attend Board meetings without fear of being embarrassed by her peers.

   [9] The Doe parents, John and Sally Doe, object to the Board's policy and practice of invocations because: they do not reflect John Doe's religious beliefs and they send a message to their children that the Board approves of Christian prayer; Sally

<u>of Great Falls</u>, 376 F.3d 292, 294 (4th Cir. 2004) (plaintiff, who

"regularly attended" council meetings at which prayers occurred,

had standing); <u>Coles v. Cleveland Bd. of Educ.</u>, 171 F.3d 369, 374

(6th Cir. 1999) (student and teacher, who attended board meeting at

which prayer took place, had standing); <u>Murray v. City of Austin</u>,

947 F.2d 147, 151 (5th Cir. 1991) (plaintiff, who submitted

affidavit alleging exposure to cross on city's insignia, had

standing); <u>Doe v. Beaumont Indep. Sch. Dist.</u>, 240 F.3d 462, 467 (5th

Cir. 2001)(en banc)(holding that exclusion from the "benefits of a

school-financed educational offering [is] a concrete, judicially

cognizable injury" such that students and parents had standing to

bring Establishment Clause challenge where they alleged that they

could not "participate in the school's offered program without

taking part in an unconstitutional practice").

---

Doe says the school-sponsored prayer interferes with her right to direct the religious upbringing of her children.

The Doe parents also assert that they have standing because they have requested to give invocations at Board meetings, and were refused; thus, they urge, they have been denied the opportunity to give an invocation that comports with their religious beliefs. <u>See</u> <u>Simpson v. Chesterfield County Bd. of Supervisors</u>, 404 F.3d 276, 280 n.2 (4th Cir. 2005) ("Simpson's exclusion from the list of those eligible to give an invocation is an injury sufficient to satisfy standing requirements"); <u>Snyder v. Murray City Corp.</u>, 159 F.3d 1227, 1229-30 (10th Cir. 1998) (plaintiff denied opportunity to present prayer at city council meeting). Because the Doe parents have sufficiently shown standing based on their direct contact with prayers at Board meetings, the Court need not address any other basis for standing, or the assertion that the Doe parents have taxpayer standing; the Court notes that the Does have not submitted any record evidence confirming that the School Board expends any funds on its prayer policy.

## The Establishment Clause

This case presents the acutely quarrelsome issue of whether the Tangipahoa Parish School Board's practice of opening its meetings with a prayer can meet today's precedential demands of the Establishment Clause of the First Amendment.

To answer the question, the Court must sort through the doctrinal tension that is First Amendment Establishment Clause jurisprudence[10] to decide whether, as plaintiffs' wish, school board

---

[10] As the Sixth Circuit has remarked:

Although th[e] constitutional directive is seemingly straightforward, the case law that has developed under the Establishment Clause has transformed it into a "blurred, indistinct, and variable barrier" whose application turns on sifting through the facts of each individual case. [Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).] A single factual difference consequently can serve to entangle or free a particular governmental practice from the reach of the Clause's constitutional prohibition. Compare Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)(holding that a nativity scene in a town square did not violate the Establishment Clause because it was surrounded by secular Christmas figures) with Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 601-02, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)(holding that a nativity scene in a town square violate[d] the Establishment Clause because it stood apart from the other Christmas decorations on display in the square).

Coles v. Cleveland Board of Education, 171 F.3d 369, 376 (6th Cir. 1999).

meetings are more like public school classrooms and public school extracurricular activities, or, whether, in reality, school board meetings are more like the legislative sessions of states and Congress or other deliberative bodies. If viewed through the plaintiffs' eyes, the wall of separation between church and state is at its unyielding highest: in the public school context, the U.S. Supreme Court has been especially and understandably vigilant in prohibiting school-sponsored religious activity. But if the meetings are legislative or otherwise deliberative in nature, the wall between church and state is considerably lower: in respecting the long history of prayer (dating back to the nation's First Congress) to open legislative sessions, the high court has upheld government-sponsored prayer in the context of legislative and other deliberative bodies.

Mindful that constitutional issues should be decided on the most narrow, and limited basis, and that the First Amendment's Establishment Clause involves delicate, fact-sensitive and historic issues, the Court's analysis is informed by the constitutional text, set on the stage of our Founding history.

Religion enjoys special constitutional status: its own explicit treatment in the text of the Bill of Rights to the Constitution was crucial to ensure that the incendiary struggles that American colonists had confronted would not continue to plague

the new Republic's citizens.[11]   The Establishment Clause of the First Amendment, made applicable to states through the Fourteenth Amendment, provides that a state "shall make no law respecting an establishment of religion."  U.S. CONST. Amend. I.  The purpose of the Free Exercise and Establishment Clauses of the First Amendment, as explained by the high court, is "to prevent, as far as possible, the intrusion of either [the church or the state] into principles of the other."  Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971); Lee v. Weisman, 505 U.S. 577, 589, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) ("The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission.").  "At the same time, however, [the Supreme Court] has recognized that 'total separation is not possible in an absolute sense[']...[s]ome relationship between government and religious organizations is inevitable."  Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)(citing Lemon, 403 U.S.

---

[11] Indeed, as the Supreme Court has remarked:

It is a matter of history that th[e] practice of establishing governmentally composed prayers for religious services was one of the reasons which caused many of our early colonists to leave England and seek religious freedom in America.

Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

at 672).  An open acknowledgment of a Supreme Being has, from the Founding, been part of the fabric of our national spirit...with some limits.

"It is beyond dispute that, at a minimum," the Supreme Court has observed, "the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith or tends to do so." <u>Lee v. Weisman</u>, 505 U.S. 577, 589, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(citations omitted); <u>see also</u> <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 605, 109 S.Ct. 3086, 3107, 106 L.Ed.2d 472 (1989)("Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions").

The constitutional propriety of the School Board's policy depends on whether the Court embraces the defendants' argument that the School Board is a public body and that the permissive prayer principles applicable to legislative prayer apply, or whether the Court adopts the plaintiffs' plea that the School Board is distinct from a legislative body, given the occasional participation of students, so that the more restrictive principles applicable, in the public school prayer context, must apply.  Our historic

distaste for state-compelled religion drives this principled dispute.

A. Public School Prayer Cases

In the public school prayer context, the Supreme Court's Establishment Clause jurisprudence has been particularly vigilant in sustaining almost every challenge to government-sponsored religious expression or involvement in the public schools. Similarly, the Fifth Circuit has "evaluated state action challenged on Establishment Clause grounds under each of 'three complimentary (and occasionally overlapping) tests' established by the Supreme Court." <u>Freiler v. Tangipahoa Parish Bd. of Edu.</u>, 185 F.3d 337, 343 (5th Cir. 1999) (citations omitted)(noting "[o]ur multi-test analysis in past cases has resulted from an Establishment Clause jurisprudence rife with confusion and from our own desire to be both complete and judicious in our decision-making").[12]

---

[12] A number of federal courts have held that school-sponsored prayer is unconstitutional in a variety of contexts that extend beyond the walls of the public school classroom, including school-sponsored ceremonies, athletic events, and extracurricular activities. <u>See</u>, <u>e.g.</u>, <u>Borden v. Sch. Dist.</u>, 523 F.3d 153, 166, 174-75 (3d Cir. 2008, cert. denied, 129 S.Ct. 1524 (2009)(noting that "if a school 'affirmatively sponsors the particular religious practice of prayer,' it is in violation of the Establishment Clause," and holding each coach's participation in pre-game football prayers to be unconstitutional)(quoting <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 313 (2000)); <u>Doe v. Duncanville Indep. Sch. Dist.</u>, 70 F.3d 402, 406-07 (5th Cir. 1995)(basketball games and practices); <u>Jager v. Douglas County Sch. Dist.</u>, 862 F.2d 824, 832 (11th Cir. 1989) (rejecting as "meritless" the School District's argument that "the school prayer cases are not implicated here because pre-game invocations occur outside the instructional environment of the classroom"); <u>Steele v. Van Buren</u>

The first test -- "widely criticized and occasionally ignored" -- the Lemon test, continues to lurk behind Establishment Clause cases. Id. at 344. The Lemon test comes in three parts; a state practice is unconstitutional if: (1) it lacks a secular purpose;[13] (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion. Id. (citing Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)). The second part, the endorsement test, is whether the government somehow endorses religion by means of the challenged policy. Id. (citing County of Allegheny v. ACLU, 492 U.S. 573, 594, 109 S.Ct. 3086, 3101, 106 L.Ed.2d 472 (1989)). Government action is obviously "endorsement" when it "conveys a message that religion is 'favored,' 'preferred,' or 'promoted' over other beliefs." County of Allegheny, 492 U.S. at 593. Neutrality must never be sacrificed. The third test, the coercion factor, calls on courts to consider school-sponsored religious activity "in terms of the coercive effect the activity has on students." Freiler, 185 F.3d at 343 (citing Lee v. Weisman, 505 U.S. 577, 589,

Pub. Sch. Dist., 845 F.2d 1492, 1495 (8th Cir. 1988) (band practice and performances).

[13] In evaluating secular purpose, it must be "sincere" and not a "sham." Wallace v. Jaffree, 472 U.S. 38, 64, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). As the Fifth Circuit observed, "the 'touchstone' is neutrality, and it is only '[w]hen the government acts with the ostensible and predominant purpose of advancing religion [that] it violates the central Establishment Clause value of official religious neutrality.'" Croft v. Governor of Texas, 562 F.3d 735, 741 (5th Cir. 2009).

112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)). Applying this test, a First Amendment violation is found when "(1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors." Id. (citing Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963, 970 (5th Cir. 1992)).

According to the Fifth Circuit, "[t]he decision to apply a particular Establishment Clause test rests upon the nature of the Establishment Clause violation asserted." Id. (noting that school board's mandate that a disclaimer be read before teaching of evolution in elementary and secondary school classes did not direct student participation in a formal religious exercise; accordingly, application of the coercion test was unnecessary).[14]

## B. The "Legislative Prayer" Exception

Legislature-sponsored prayer, however, is subject to vastly different treatment than public school-sponsored prayer. Indeed, in stark contrast to the vigilance with which the Supreme Court prohibits school-sponsored religious activity,[15] government-

---

[14] In a recent public school prayer case, the Fifth Circuit simply applied Lemon v. Kurtzman to determine that a statute that required a mandatory moment of silence in Texas schools did not have a primary effect of advancing or inhibiting religion and the statute did not foster an excessive entanglement with religion. Croft v. Governor of Texas, 562 F.3d 735 (5th Cir. 2009).

[15] See, e.g., Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(distinguishing Marsh as a narrow decision limited to its unique history, the Supreme Court applied the Lemon test to strike down school's practice of inviting clergymen to give nonsectarian invocations a public school

sponsored prayer in opening legislative sessions is constitutionally permissible and untainted. In <u>Marsh v. Chambers</u>, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the high court crafted a narrow exception to traditional Establishment Clause analysis: because the opening of legislative sessions with the recitation of prayer is deeply embedded in the "unique history" and tradition of this country, the Supreme Court upheld as constitutionally permissible the Nebraska state legislature's practice of beginning each session with a prayer from a chaplain, even one paid by the state. <u>Id.</u> at 790-93. In so doing, the Supreme Court eliminated legislative prayer from its traditional Establishment Clause disability, relying on what it considered to be an unavoidable historical analysis to justify the practice of legislative prayers.[16] <u>Id.</u>

Since <u>Marsh</u>, lower federal courts have extended <u>Marsh</u>'s reach to include opening prayers before municipal (deliberative) bodies, like county boards and city councils,[17] but the Supreme Court has

graduation ceremonies).

[16] Resorting to a historical analysis to uphold legislative prayer was necessary; otherwise, the prayers would not have survived the traditional Establishment Clause tests the Supreme Court had relied on prior to, and since, <u>Marsh</u>. <u>See Marsh</u>, 463 U.S. at 796 (Brennan, J., dissenting).

[17] <u>See</u>, <u>e.g.</u>, <u>Pelphrey v. Cobb Co., Ga.</u>, 547 F.3d 1263 (11th Cir. 2008)(county commission and planning commission); <u>Simpson v. Chesterfield Co. Bd. of Supervisors</u>, 404 F.3d 276 (4th Cir. 2004), <u>cert. denied</u>, 126 S.Ct. 246 (2005)(county board); <u>Snyder v. Murray</u>, 159 F.3d 1227 (10th Cir. 1998)(city council); <u>Dobrich v.</u>

avoided extending Marsh's reach to Establishment Clause cases generally. See, e.g., County of Allegheny v. ACLU, 492 U.S. 573, 603, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)(rejecting the dissenting argument that the Marsh historical analysis controlled the constitutionality of traditional creche displays at Christmas, noting "[h]owever history may affect the constitutionality of nonsectarian references to religion by government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed"); Edwards v. Aguillard, 482 U.S. 578, 583 n.4, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987)("such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted").

Even legislative prayer, however, is not without constitutional limits. In Marsh, after determining that legislative prayer was constitutional, the Supreme Court proceeded to discuss whether particular features of the state legislature's invocations were problematic. Marsh, 463 U.S. at 792-93. The Court noted that the prayers at issue were Judeo-Christian and that, "[a]lthough some of [the chaplain's] earlier prayers were often explicitly Christian, [he] removed all references to Christ after a 1980 complaint from a Jewish legislator." Id. at 793 n.14.

---

Walls, 380 F. Supp. 2d 366 (D. Del. 2005)(school board).

The Court went on to observe that "[t]he content of the prayer is not of concern to judges" when "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." Id. at 794-95. And that is the key. Lower courts have ever since tried to determine how to apply this language, and what sorts of limitations Marsh meant to place on legislative prayer. Exploitation and proselytizing hold the answer. The Tangipahoa Parish School Board must pay close attention to that.

Although the Supreme Court has directly addressed the constitutionality of legislative prayer only once, it explained, six years after Marsh, in County of Allegheny:

> [I]n Marsh itself, the Court recognized that not even the "unique history" of legislative prayer...can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. The legislative prayers involved in Marsh did not violate this principle because the particular chaplain had "removed all references to Christ."

492 U.S. at 603 (citations omitted). The Seventh Circuit has stated that it "read[s] Marsh as hinging on the nonsectarian nature of the invocations at issue." Hinrichs v. Bosma, 440 F.3d 393 (7th Cir. 2006)(citing Doe v. Vill of Crestwood, 917 F.2d 1476, 1479 (7th Cir. 1990), among other cases); the Seventh Circuit later reversed itself and remanded with instructions to dismiss for lack of standing. Hinrichs v. Speaker of the House of Representatives of the Ind. Gen. Assembly, 506 F.3d 584, 585 (7th Cir. 2007). In an

unpublished decision, <u>Bacus v. Palo Verde Unified School District Board of Education</u>, the Ninth Circuit held that, even if <u>Marsh</u> applied to the school board meeting context, the school board's practice of sectarian invocations (which ended "in the Name of Jesus") violated the Establishment Clause. 52 Fed.Appx. 355 (9th Cir. 2002)(the overtly Christian prayers were an inappropriate effort to "advance" Christianity as condemned by <u>Marsh</u> or to show the government's "allegiance" to that faith as targeted in <u>Allegheny</u>).

The Fourth Circuit has stopped short of holding that <u>Marsh</u> commands that legislative prayer must be nonsectarian. <u>See</u> <u>Turner v. City Council of the City of Fredericksburg, Virginia</u>, 534 F.3d 352, (4th Cir. 2008)(O'Connor, Associate Justice (Retired))(holding that the city council's decision to open its legislative meetings with nondenominational prayers does not violate the Establishment Clause). <u>Compare</u> <u>Wynne v. Town of Great Falls</u>, 376 F.3d 292 (4th Cir. 2004)(striking down town's practice of opening city council meetings with Christian prayers because such prayers violated the rule that legislative prayers not affiliate the government with the Christian religion) <u>with</u> <u>Simpson v. Chesterfield County Bd. of Supervisors</u>, 404 F.3d 276 (4th Cir. 2005)(upholding local board's policy, which required that prayers be nonsectarian, as permissible

under <u>Marsh</u> and <u>Allegheny</u>).[18] The Tenth Circuit, like the Fourth,
also focuses on whether the prayer opportunity has been exploited,
but has concluded that Marsh does not prohibit prayers that invoke
"particular concept[s] of God." <u>Snyder v. Murray City Corp.</u>, 159
F.3d 1227, 1233-34, 1234 n.10 (10th Cir. 1998)(*en banc*)(city was
"within its rights under <u>Marsh</u>" to deny permission to speaker to
recite his proposed prayer, where prayer "aggressively
proselytize[d] for his particular religious views and strongly
disparage[d] other religious views")).

The Eleventh Circuit, in a scholarly and insightful opinion,
explicitly rejected an argument that <u>Marsh</u> permits only
nonsectarian prayer; rather, that court cautioned, courts should
not evaluate the content of the prayers, absent evidence of
exploitation. <u>Pelphrey v. Cobb County, Georgia</u>, 547 F.3d 1263,
1271 (11th Cir. 2008) (to read <u>Marsh</u> as allowing only nonsectarian
prayers "is at odds with the clear directive by the [Supreme Court]
that the content of the legislative prayer 'is not of concern to
judges where...there is no indication that the prayer opportunity
has been exploited to proselytize or advance any one...faith or
belief'"). In rejecting the sectarian/nonsectarian bright-line

---

[18] In permitting a county to invite clergy from diverse
congregations to offer diverse prayers at government meetings, the
Fourth Circuit in <u>Simpson</u> distinguished its earlier decision in
<u>Wynne</u> because the prayers of the city council in <u>Wynne</u> had been
exploitative and had "underminded...participation by persons of all
faith in public life." <u>Id.</u>

test, the Eleventh Circuit reads <u>Marsh</u> to favor a factor-based test, noting that the <u>Marsh</u> Court considered several factors to determine whether the legislative prayers had been exploited to advance one faith: "The [Supreme] Court weighed the chaplain's religious affiliation, his tenure, and the overall nature of his prayers." <u>Id.</u> (citing Marsh, 463 U.S. at 792-95). "The 'nonsectarian' nature of the chaplain's prayers [in <u>Marsh</u>] was one factor in this fact-intensive analysis." <u>Id.</u> at 1272 (noting the difficulty in identifying the boundary between sectarian and nonsectarian expressions; not even counsel for plaintiff could provide a workable definition of sectarian expressions).[19]

_____

[19] The <u>Pelphrey</u> court wrote:

The taxpayers' counsel fared no better than his client in providing a consistent and workable definition of sectarian expressions. In the district court, counsel...deemed "Heavenly Father" and "Lord" nonsectarian, even though his client testified to the contrary. At...oral argument [in the circuit court], counsel asserted two standards to determine when references are impermissibly "sectarian"[, first stating] "It is sectarian when the...prayer has the effect of affiliating the government with one specific faith or belief," but he later described a reference as "sectarian" when it "invokes the name of a divinity...in which only one faith believes." Counsel had difficulty applying [both] standard[s] to various religious expressions. When asked, for example, whether "King of kings" was sectarian, he replied, "King of kings may be a tough one...It is arguably a reference to one God...it might not be sectarian."

Ultimately, the Eleventh Circuit concluded that the (1) identity of the speakers (who included members of the Jewish, Unitarian, and Muslim faiths) and (2) the prayers at issue (which included a diversity of religious expressions (including references to "Jesus Christ", "Allah", "Mohammed", and the Torah)), when compared to the Judeo-Christian prayers permitted in <u>Marsh</u>, supported the finding that the prayers taken as a whole did not advance any particular faith. <u>Id.</u> at 1277-78.

Finally, at least one court has rejected <u>Marsh</u>'s application altogether, in the context of school board prayer: the only appellate court to rule on the issue of whether <u>Marsh</u>'s exception for legislative prayer applies to school board meetings has ruled that it does not; the Sixth Circuit decided that the traditional Establishment Clause school prayer line of cases applies to opening school board meetings with prayers. <u>Coles v. Cleveland Board of Education</u>, 171 F.3d 369, 381 (6th Cir. 1999) ("the fact that school board meetings are an integral component of the Cleveland public school system serves to remove it from the logic in <u>Marsh</u> and to place it squarely within the history and precedent concerning the school prayer line of cases").[20]

---

<u>Id.</u> at 1272.

[20] <u>Coles</u>, factually different because meetings took place at school and a student was a board member, is also a perversion of <u>Marsh</u>, as several judges of the Sixth Circuit have caustically observed when that court denied a request for an *en banc* rehearing:

This Court must therefore determine whether a school board is more like a legislature or other deliberative public body, or more somehow like a public school.

## III.

Constitutional issues should be decided on the most narrow, limited basis. See Dallas Joint Stock Land Bank v. Davis, 83 F.2d 322, 323 (5th Cir. 1936)("[I]t is a settled rule in the federal courts that questions of constitutional law...will be decided only where a patent necessity for such decision exists, and then only no more broadly than the precise situation in question requires"); see also Liverpool, N.Y. & Philadelphia S.S. Co. V. Comm'rs of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)(admonishing "never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied").

---

> The panel's opinion, which the failure of the court to grant rehearing en banc allows to stand, represents a radical departure from Supreme Court precedent on the permissibility of prayer and solemnization at the beginning of government functions.... The panel majority's attempt to carve out an exception for bodies that deal with educational subjects is unconvincing. This is especially so in light of the large proportion of the attention of general legislative bodies that is consumed with the subject of education.

Coles v. Cleveland Bd. of Edu., 183 F.3d 538, 539 (6th Cir. 1999) (Boggs, Circuit Judge, dissenting from the denial of rehearing en banc, joined by Judges David A. Nelson, Alan E. Norris, Suhreinrich, Siler and Batchelder).

The Does invoke the reasoning of <u>Coles</u>, urging the Court that traditional Establishment Clause jurisprudence applicable to school prayer cases applies to the Tangipahoa Parish School Board's prayer policy. The Court disagrees: <u>Marsh</u> applies to this deliberative public body, and it strains reason to conclude otherwise.

The command of <u>Marsh</u> is plain:

> The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.

463 U.S. 783, 786. The Does argue, unpersuasively, that the Court should discount the phrase "and other deliberative bodies" as mere dicta. But the function of the School Board, and the nature of its meetings, lead the Court's inquiry to an application of <u>Marsh</u>.

Indeed, it is beyond dispute that the School Board is a public body.[21] Because the function of the School Board, as the body

---

[21] Neither party seriously disputes that the Tangipahoa Parish School Board, a creature of the state constitution (La. Const. art. VIII § 9(A)), is a public body, as defined by Louisiana law. La.R.S. § 42:4.2 (West 2001). As administrators of public education, the elected members of the School Board are responsible for the operation and government of the 35 public schools (with more than 18,000 students) that comprise the Tangipahoa Parish school system. Indeed, the School Board is a state agency with duties and obligations defined by statute; a sampling of the School Board's statutory duties include: "determin[ing] the number of schools to be opened, the location of school houses, the number of teachers to be employed [and their salaries]"; "adopt[ing] rules and regulations governing the terms and conditions, including fees if any, under which [school] buildings...[may] be used outside of regular school hours for academic purposes [such as] tutoring and study hall"; "mak[ing] such rules and regulations for its own

governing public schools, is more like a legislature than a public school classroom or event, and is patently a deliberative body under the law, the plaintiffs fail to persuade the Court that traditional Establishment Clause principles of <u>Lemon</u> apply.[22] However, the constitutional permissiveness of <u>Marsh</u>-context prayer is measured strictly by notions of exploitation and proselytizing, and it is in that arena that the School Board could have grave problems.

As noted, opening government sessions with prayer pursuant to <u>Marsh</u> is not without constitutional limits: the Tangipahoa Parish School Board may not implement a prayer policy that advances one religion; the Court must examine whether in this case the prayer opportunity has been exploited to advance Christianity.  To proselytize.  In applying <u>Marsh</u>, the Court approves and aligns itself with <u>Pelphrey</u>'s wise and thoughtful approach; the Eleventh

_____

government, not inconsistent with [other] law[s] or with [other] regulations"; "securing for the schools...all funds destined for the support of the schools[.]" <u>See</u> <u>generally</u> La.R.S. § 17:81.

[22]    The Does, however, argue that the unspecific participation of students at the board meetings distinguishes those meetings from legislative (or other public body) sessions and thus demands application of traditional Establishment Clause rules.  The Court acknowledges that constituency is relevant in traditional Establishment Clause jurisprudence, but <u>Marsh</u> is an exception to that line of cases. Indeed, that school children may participate in school board meetings cannot be dispositive of the constitutional analysis:  students may well visit a state or federal legislative session, or some municipal body session as part of field trip for a political science class or civics course, or visit a courtroom, but finding that school children are present would not render unconstitutional opening those sessions with prayer.

Circuit expressly rejected the application of a sectarian/nonsectarian bright line test. See Pelphrey, 547 F.3d at 1278 ("Marsh prohibited the selection of invocational speakers based on an "impermissible motive" to prefer certain beliefs over others"). Fidelity to Marsh commands not a content-based approach, or an inquiry into whether prayers are sectarian or nonsectarian at the outset, but, rather, focuses on exploitation of the prayer opportunity and efforts, direct or not, to proselytize; to promote or sell a religion. The Supreme Court in Marsh discussed the tenure of the hired chaplain and held "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive, ... long tenure does not in itself conflict with the Establishment Clause." Marsh, 463 U.S. at 793-94. Noting that the prayers were offered in the Judeo-Christian tradition, the Supreme Court refused to examine their content because:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

Marsh, 463 U.S. at 794-95. In other words, in light of the historical background of legislative prayer, Marsh teaches us that sectarian references do not inherently violate the Establishment Clause; rather, important factors inform the constitutionality of legislative prayer practice: the identity of the speaker, the

selection of the speaker, the method and process of selection, and the nature of the prayers. _Pelphrey_, 547 F.3d at 1277-79. In approving _Pelphrey_ and _Marsh_, this Court refuses to "reduc[e] Marsh to a sectarian/non-sectarian litmus test." _See_ _Doe v. Tangipahoa Parish Sch. Bd._, 473 F.3d 188, 212 (5ᵗʰ Cir. 2006)(Clement, J., concurring in the judgment in part and dissenting in the judgment in part).[23]

B.

The Court's examination of whether the School Board had an impermissible motive in enacting its prayer policy, or any determination as to whether the prayer opportunity has been exploited to advance one faith over another is inhibited by an incomplete record. While the defendants insist that their prayer policy is at least as inclusive as the ones upheld in _Simpson_ and _Pelphrey_, summary judgment is inappropriate on this record: unlike the diverse prayergivers (prayers were offered by members of the Jewish, Unitarian, Muslim and Christian faiths) and diverse

---

[23] Attempts to apply a sectarian/non-sectarian "bright line" test by evaluating prayer content first "needlessly puts federal courts in the position of drawing the constitutional (and theological) line between sectarian and non-sectarian prayer" in violation of Supreme Court precedent. _Id._ (Clement, J., concurring in the judgment in part and dissenting in the judgment in part)(citing _Marsh_). Indeed, the Supreme Court has admonished against court intrusion into prayer content as itself violative of the Establishment Clause. _See_ _Lee v. Weisman_, 505 U.S. at 581, 112 S.Ct. at 2652 (public school officials should not have directed rabbi to provide a nonsectarian invocation at graduation ceremony, noting that government should generally have no role in "direct[ing] and controll[ing] the content of...prayers").

references in the prayers at issue in <u>Simpson</u> and <u>Pelphrey</u>, here, the parties sharply dispute whether the prayer opportunity before School Board meetings has been exploited to advance Christianity. (And the repetition of Ms. Jenkins in "mistakenly" inviting only out-of-parish Christian clergy is perturbing.)  The Court finds that factual issues, such as the following, preclude summary judgment:

- whether School Board's policy exploits the prayer opportunity to proselytize or advance Christianity, or to disparage other faiths or beliefs;[24]

- whether the School Board has violated its own speaker selection policy by reaching outside the Parish to Christian clergy but not other clergy of other faiths.[25]

---

[24]  The plaintiffs cite to select deposition testimony of various board members that stated that board members could not recall a non-Christian invocation; in addition:

- Ann Smith testified: "the mindset is that invocation is prayer and it's a Christian prayer."
- Robert Potts, confronted with the possibility of someone giving a Satanist invocation, declared: "it would not happen again with that dude, you can rest assured of that[;] we are talking about a Christian prayer."
- Bailey-Simmons, when asked whether the policy was "made by Christians and for Christians", stated: "I mean, it has turned out to be that way, and that's the dominant faith or dominant belief."

On the other hand, the defendants introduced evidence suggesting that it was the Board members' intent that no one would be excluded from giving the invocation as long as they met the location requirements, and that no research into Tangipahoa Parish's demographics was done before adoption of the policy.

[25]  The plaintiffs submit evidence that the School Board violated its own speaker selection procedure by including only Christian churches outside of Tangipahoa Parish on the Congregation List in 2007 and 2008.  As indicative of the motivation behind the

Accordingly, a trial on the merits to fully resolve the issues of the School Board's prayer policy, and to determine whether the prayer opportunity has been exploited, must take place. The cross-motions for summary judgment are therefore DENIED.

New Orleans, Louisiana, June 24, 2009.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

prayer policy, the plaintiffs note that all School Board members are Christian; the plaintiffs also point to former School Board president Link, who stated that the selection procedure provides "control over an individual belonging to an organized religion because you know what they are going to say because they belong – if I am a Catholic and I get up there and start expounding all kind of crazy stuff, you pretty well are certain that they are going to follow certain beliefs that's put forth by their church."